# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAHI ISSA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-168-LPS |
| | : | |
| DELAWARE STATE UNIVERSITY, | : | |
| HARRY WILLIAMS, Individually and in his | : | |
| official capacity; ALTON THOMPSON, | : | |
| Individually and in his official capacity; | : | |
| HARRY R. DOWNES, JR., Individually and in | : | |
| his official capacity; JUSTIN BUCHWALD, | : | |
| Individually and in his official capacity; and | : | |
| DOMINICK CAMPALONE, Individually and in | : | |
| his official capacity; | : | |
| | : | |
| Defendants. | : | |

Benjamin J. Schladweiler, GREENBERG TRAURIG, LLP, Wilmington, DE

Giancarlo Scaccia, GREENBERG TRAURIG, LLP, New York, NY

Garrett B. Moritz and Anne M. Steadman, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE

> Attorneys for Plaintiff

James D. Taylor and Randall S. MacTough, SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, DE

> Attorneys for Defendants

## MEMORANDUM OPINION

April 23, 2019
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff Jahi Issa ("Plaintiff") filed this action alleging nine counts of discrimination and violations of his constitutional rights pursuant to the Americans with Disabilities Act Amendments Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1983, 1988, and 2000e–5, et seq., and the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. (D.I. 2; D.I. 58)

Presently before the Court is: (1) Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") (D.I. 112) regarding his Americans with Disabilities Act Amendments Act claim and Defendants' affirmative defenses; and (2) Defendants Delaware State University, Harry Williams, Alton Thompson, Harry R. Downes, Jr., Justin Buchwald, and Dominick Campalone's ("Defendants") Motion for Partial Summary Judgment ("Defendants' Motion") (D.I. 107), regarding Count IV (Defamation against Thompson), Count V (Retaliation against all Defendants except Delaware State University), Count VI (Due Process claims against Harry Williams and Alton Thompson), Count VII (Intentional Discrimination against Delaware State University), and Count IX (Retaliation against Delaware State University).

Neither party is moving for summary judgment on Count I (False Arrest and False Imprisonment against Harry R. Downes, Dominick Campalone, and Justin Buchwald), Count III (Breach of Contract against Delaware State University), or Count VIII (Hostile Work Environment against Delaware State University).

Having considered the parties' briefs and numerous exhibits (*see* D.I. 107, 109, 113, 114, 123, 126, 127, 136, 138, 139) and having heard oral argument on April 8, 2019 (*see* D.I. 153 ("Tr.")), the Court will grant-in-part and deny-in-part both Plaintiff's Motion and Defendants'

Motion.[1]

<h1 style="text-align:center">BACKGROUND[2]</h1>

Plaintiff was an assistant professor of history and Africana studies in the Department of History, Political Science, and Philosophy ("HPSP") at Delaware State University ("DSU" or the "University") in Dover, Delaware. (D.I. 58 ("Second Amended Complaint") ¶ 10) He generally alleges a history of harassment and discrimination throughout his time at DSU. (*See, e.g., id.* ¶¶ 22-27, 29-30, 32-36, 39)

In 2010, Plaintiff applied for a promotion to associate professor. (*Id.* ¶ 15) The promotion and tenure committee voted to recommend approval of Plaintiff's application but Marshall Stevenson, Jr. ("Stevenson"), Dean of DSU's College of Arts, Humanities and Social Studies, disagreed with that decision and denied Plaintiff the promotion. (*Id.* ¶¶ 16, 18) DSU President, Defendant Harry Williams ("Williams"), informed Plaintiff that he was not recommending Plaintiff for promotion. (*Id.* ¶ 20) That same year, 2010, two of Plaintiff's HPSP colleagues, both of whom are Caucasian females, were promoted. (*Id.* ¶ 21) Plaintiff, an African-American male, contends that these individuals "were not as qualified" as he was. (*Id.*)

Plaintiff alleges that in 2011, he was experiencing chest pain and post-traumatic stress disorder ("PTSD") related to his work at DSU. (*Id.* ¶¶ 35, 38-39) He filed a charge of

---

[1] After today's decision, the case will proceed on only Counts I, II, III, V, VII, VIII, and IX and on none of the affirmative defenses.

[2] While the record reflects many genuine disputes of material fact, several of which are identified throughout this Opinion, the allegations described in this Background are largely uncontested—and, where in dispute, the record contains evidence from which a reasonable factfinder could find that the allegation being described can be proven by a preponderance of the evidence.

discrimination with the Delaware Department of Labor on July 15, 2011. (*Id.* ¶ 42) Plaintiff applied again for a promotion that September and again received a committee recommendation. (*Id.* ¶¶ 45, 49) But, again, Stevenson and Williams did not support the recommendation and Plaintiff was not promoted. (*Id.* ¶¶ 50-51)

On March 1, 2012, Plaintiff attended a protest aimed at the "growing trend in which DSU was abandoning its mission associated with being an HBCU (Historically Black College and University)." (*Id.* ¶ 54) Plaintiff alleges that his free speech rights were violated when he was "physically assaulted, injured, and arrested" by Defendants Harry Downes, Jr. ("Downes"), DSU's police chief, and Justin Buchwald ("Buchwald"), a DSU police officer. (*Id.* ¶¶ 56, 58) Because Plaintiff fell to the ground during the arrest, he was transported to a hospital and then arrested and "jailed for several hours." (*Id.* ¶¶ 59, 61) Plaintiff believes he "was specifically targeted by DSU police at the behest of other named Defendants for the purpose of chilling [Plaintiff's] expression of a viewpoint with which other named Defendants disagreed, and as part of a continuing scheme to harass Plaintiff with malice, in retaliation for his continual filing of grievances with the [U]niversity and due to his filing of charges" with the Equal Employment Opportunity Commission. (*Id.* ¶ 57)

Defendants have a strikingly contrasting portrayal of what occurred at the March 1, 2012 protest. They contend that Plaintiff "resisted Chief Downes' efforts to speak with [Plaintiff]" and, in response to Downes "gently touch[ing Plaintiff's] arm" in order to get his attention, Plaintiff "swung his arm and contacted Chief Downes." (*See* D.I. 109 at 7) A criminal complaint filed by Defendant Dominick Campalone ("Campalone"), a DSU police sergeant, charged Plaintiff with offensive touching, resisting arrest, and two counts of disorderly conduct. (D.I. 58 ¶ 60)

The next day, DSU notified Plaintiff that it was investigating the incident and put Plaintiff on paid administrative leave. (*Id.* ¶ 71)  A month later, on April 1, 2012, Defendant Williams sent Plaintiff a letter of appointment for the 2012-2013 academic year and "Terminal Contract," which Plaintiff accepted "under protest," after DSU rejected his initial "conditional acceptance." (*Id.* ¶¶ 75, 80-81)  Plaintiff, citing the criminal proceedings against him, did not meet with DSU regarding its administrative investigation. (*Id.* ¶¶ 86-87)  On June 1, 2012, Defendant Alton Thompson ("Thompson"), DSU's provost, informed Plaintiff that DSU would be "pursuing his termination." (*Id.* ¶ 89)  On August 17, 2012, Plaintiff was given a notice of discharge, which Plaintiff contends was in violation of the Collective Bargaining Agreement ("CBA") between DSU's Board of Trustees and its chapter of the American Association of University Professors ("AAUP"). (*Id.* ¶ 91)

None of the four criminal charges filed against Plaintiff resulted in a conviction.  The disorderly conduct charge for failure to disperse was dismissed by the trial court for lack of probable cause. (*Id.* ¶ 100)  The State dismissed the other disorderly conduct charge, which had been based on offensive language, as well as the offensive touching charge. (*Id.* ¶¶ 101-03)  A trial on the charge of resisting arrest resulted in a hung jury, and that charge was ultimately dismissed by the Court of Common Pleas before a scheduled re-trial (due to concerns over the leaking of confidential jury deliberation information). (*Id.* ¶¶ 104-06)

Plaintiff filed a *pro se* Complaint in this Court on February 7, 2014, based on the denial his promotion application, his arrest and the prosecution of the charges arising from that arrest, and his termination from DSU. (D.I. 2)  The Court allowed Plaintiff to proceed *in forma pauperis.* (*See* D.I. 4)  The Court then screened the Complaint under 28 U.S.C. § 1915(e)(2).  On August 11, 2014, the Court issued a memorandum opinion and order dismissing certain

claims (for reasons including sovereign immunity) and giving Plaintiff leave to amend certain others. (*See* D.I. 5, 6)  During the pendency of the criminal case, this case was stayed, and Plaintiff was provided extensions to his deadline for filing an amended complaint.  (*See* D.I. 11, 14)

Plaintiff retained counsel in February 2015 and filed a redrafted Amended Complaint on April 27, 2015.  (D.I. 16)  It set forth 14 claims for relief under state and federal law, including 42 U.S.C. § 1983.  On May 26, 2015, Plaintiff filed a motion asking the Court to reconsider its finding of sovereign immunity and dismissal of his malicious prosecution claim.  (*See* D.I. 21, 22)  On April 1, 2016, Williams, Thompson, Downes, Buchwald, and Campalone (together, the "Individual Defendants"), along with DSU, moved to dismiss.  (D.I. 32)  On August 4, 2017, the Court issued an opinion granting Plaintiff's motion for reconsideration but continuing to dismiss Plaintiff's malicious prosecution claim, and also granting and denying Defendants' motion to dismiss, thereby dismissing additional claims.  (D.I. 40, 41)

On October 12, 2017, Plaintiff's counsel withdrew and, subsequently, the case was stayed until the Court appointed counsel on February 27, 2018.  (D.I. 50, 54, 55)  Plaintiff filed a Second Amended Complaint ("SAC"), which is now the operative Complaint, on April 24, 2018. (D.I. 58)  The parties filed their summary judgment motions, as well as additional pretrial motions, on December 10, 2018.[3]

As set out above, on December 10, 2018, Defendants moved for summary judgment on certain claims (D.I. 107) and Plaintiff also moved for summary judgment on other claims (D.I.

---

[3] At the April 8, 2019 hearing, the Court heard argument on and denied both Defendants' motion to preclude certain expert testimony (D.I. 104) and Plaintiff's motion for spoliation sanctions (D.I. 105).  (*See also* D.I. 152)

112). The Court heard oral argument on these motions on April 8, 2019.

## LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be— or, alternatively, is— genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks

omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## DISCUSSION

### A.    Plaintiff's Motion

Plaintiff moves for summary judgment on his Americans with Disabilities Act Amendments Act ("ADAAA") claim and on Defendants' affirmative defenses. For the reasons set out below, the Court will deny the motion with regard to the ADAAA claim and grant it with regard to Defendants' affirmative defenses.

### 1.    Count II – ADAAA Claim against DSU

Plaintiff alleges that DSU failed to accommodate his request, based on his PTSD, for a new office, in violation of the Americans with Disabilities Act Amendments Act of 2008 (and the Americans with Disabilities Act ("ADA")) . (D.I. 113 at 12-17) The ADA requires that an employer offer "reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112. In order to prove a violation of the ADA, Plaintiff must establish that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Ozlek v. Potter,* 259 Fed. Appx. 417, 419-20 (3d Cir. 2007). To establish that Defendants breached their duty to provide a reasonable accommodation, Plaintiff has to show that: (1) Defendants knew about his disability; (2) Plaintiff requested accommodations or assistance for his disability; (3) Defendants did not make a good faith effort to assist Plaintiff in seeking accommodations; and (4) Plaintiff could have been reasonably accommodated but-for Defendants' lack of good faith. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 311-12 (3d Cir. 1999).

Plaintiff's motion for summary judgment fails (at least) at the first element of his claim. A person may be considered to have a "disability" if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). "Congress declared that 'the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations,' and that 'the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Fleck v. WILMAC Corp.*, 2011 WL 1899198, at *5 (E.D. Pa. May 19, 2011) (citing Pub. L. No. 110–325, § 2(b)(5), 122 Stat. at 3554). However, this does not mean that no analysis should occur. *See Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012) ("Although Congress sought to abrogate the 'significantly or severely

restricting' requirement as it pertained to the 'substantially limits' factor of the ADA, the ADAA

still requires that the qualifying impairment create an 'important' limitation . . . .   Therefore,

even under the relaxed ADAA standards, a plaintiff is still required to plead [and ultimately

prove] a substantially limiting impairment.").

Plaintiff asserts that he suffers PTSD, an undisputed disability, and therefore no

"limitation" analysis is required.   (*See* D.I. 113 at 12)   In support, Plaintiff relies on the

regulations issued by the U.S. Equal Employment Opportunity Commission ("EEOC"), which

provide that some "types of impairments," including PTSD, "will, as a factual matter, virtually

always be found to impose a substantial limitation on a major life activity," leaving "the

necessary individualized assessment" as "particularly simple and straightforward."   29 C.F.R §

1630.2(j)(3)(ii).   The regulations do not, however, state that the Court can or should conclude

Plaintiff was disabled based solely on his alleged PTSD diagnosis without engaging in any

limitation analysis.

There is little in the record with respect to whether Plaintiff was actually diagnosed with

PTSD and, regardless, of what (if any) substantial impairments he consequently experienced.

The record is largely devoid of medical records.   It does include: (1) a June 17, 2011 letter from

a psychiatrist, Dr. Patricia Newton, to Defendants, stating that Plaintiff "is currently

demonstrating *symptoms related to* a Post Traumatic Stress Disorder *secondary* to job related

stressors and experiences" (D.I. 114 Ex. 10) (emphasis added); (2) a July 16, 2011 fax cover

sheet, attached to Dr. Newton's June letter, notifying DSU's Human Resources Office "[t]his

patient was seen again today [and] the diagnosis made on 6/16/11 still stands" (*Id.*); (3) a

September 14, 2011 letter from Plaintiff to DSU's Board of Trustees, in which Plaintiff states

that he is suffering from PTSD (*id*. Ex. 11); and (4) Plaintiff's deposition testimony that he "was

under a lot of stress" and "probably slowed down some" in the period following his visit to Dr. Newton (D.I. 123 Ex. 3 at 210-11). A reasonable factfinder, taking this evidence in the light most favorable to Plaintiff, **could but need not** find that he was suffering from PTSD and that this impairment substantially limited major life activities, including working. Therefore, summary judgment for Defendants on this issue would not be warranted (and, in any event, is not sought by Defendants). But neither would summary judgment be appropriate for Plaintiff, as a reasonable factfinder taking the evidence in the light most favorable to Defendants could well find that Plaintiff failed to prove that he had (or even was diagnosed with) PTSD or that any of his major life activities were substantially impaired.

For instance, Dr. Newton's June 17, 2011 is equivocal. Her letter does not clearly state that Plaintiff "suffers from PTSD" or even that he has ever been "diagnosed with PTSD." Instead, it merely states that Plaintiff is "demonstrating symptoms related to" PTSD which is secondary "to job related stressors and experiences." Particularly given that Plaintiff testified that he "was under a lot of stress" (D.I. 123 Ex. 3 at 211), a reasonable factfinder could find that Plaintiff's symptoms were primarily stress-related, and perhaps not due to PTSD. The July fax cover sheet is equally ambiguous, reiterating an earlier "diagnosis" that remains (as far as the record demonstrates) unstated.

Plaintiff's identification of evidence supporting a finding that DSU's administrators **regarded** him as suffering from PTSD does not support a conclusion that, as a matter of law, a jury must find that he has proven he **actually was** disabled within the meaning of the ADA. (*See* D.I. 138 at 4, 6) These administrators are neither medical professionals nor otherwise qualified to diagnose Plaintiff; nor is there any evidence they examined Plaintiff. Even assuming a factfinder could accept the observations of these administrators that Plaintiff was

11

showing "symptoms of emotional instability" (D.I. 138 at 6), this, too, does not compel a conclusion that Plaintiff had PTSD or was disabled.    There remains a genuine dispute of material fact on this issue.

Accordingly, the Court must deny Plaintiff's motion for summary judgment on his ADA claim.[4]

## 2.    Affirmative Defenses

Plaintiff moves for summary judgment on Defendants' nine affirmative defenses.    (D.I. 113 at 18)[5]   In response, Defendants agree to entry of summary judgment on all but one of their affirmative defenses: failure to mitigate damages.    (*See* Tr. at 82; D.I. 123 at 17)

---

[4] The record reveals other genuine disputes of material fact precluding a grant of summary judgment to Plaintiff on his ADAAA claim.    A reasonable factfinder may or may not find that any of Plaintiff's major life activities were substantially impaired, as the record contains little more on this point than Plaintiff's testimony that he was "probably slowed down" by PTSD. (D.I. 123 Ex. 3 at 211)   Also, a reasonable factfinder may or may not find that Plaintiff's request for a new office location was a request for a reasonable accommodation due to his PTSD, as the record does not contain evidence from which a jury (taking the evidence in the light most favorable to Defendants) would be required to find that Plaintiff's request was in any way connected to his PTSD.   *See Taylor*, 184 F.3d at 313 ("What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation."). The record contains multiple instances of Plaintiff tying his request for a different office to his concerns for his personal safety (*see, e.g.*, D.I. 114 Ex. 11; *see also id.* Ex. 16 (Plaintiff writing to Provost Thompson "In need of a safe haven"))—but from this a jury may reasonably find that Defendants knew only that Plaintiff felt unsafe, not that he needed a reasonable accommodation for PTSD.   Even the internal communications among Defendants relating to Plaintiff's request for an office relocation (*see, e.g.*, D.I. 114 Ex. 12) do not compel a finding that Defendants had notice that Plaintiff's request was connected to his PTSD (although such evidence could support such a finding).   Further, as Defendants emphasize, Plaintiff began asking for a new office location at least several months prior to sending Dr. Newton's "PTSD letter" to DSU.   (*See* D.I. 123 at 12)

[5] The Court disagrees with Defendants that Plaintiff's motion should be viewed as an untimely motion to strike.   (D.I. 123 at 15-16)   Federal Rule of Civil Procedure 56 permits a plaintiff to move for summary judgment on a defense.

Plaintiff observes that in response to his interrogatory seeking "the complete factual and legal basis for each Affirmative Defense," Defendants stated: "Plaintiff cannot meet his burden of proof on any of his claims and, even if he can, Plaintiff's own bad acts, failure to mitigate his damages, and failure to comply with administrative process negate or abrogate any recovery available to Plaintiff." (D.I. 114 Ex. 17) Plaintiff points out that Defendants did not provide any evidentiary support for this conclusory response. (D.I. 113 at 18)

Pursuant to Federal Rule of Civil Procedure 26(a) and (e), a party has a duty to disclose what it "may use to support its . . . defenses" and to "supplement or correct its disclosure or response." "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . . . at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(e)(1).

Here, Defendants failure to disclose (prior to their answering brief in opposition to Plaintiff's Motion) which affirmative defense on which they were proceeding and the evidentiary basis for it was neither substantially justified nor harmless. Even accepting that all of the evidence on which Defendants now disclose they will rely on to show a failure to mitigate damages was produced by Plaintiff, Defendants had an obligation to identify this evidence to Plaintiff during discovery (e.g., in response to Plaintiff's interrogatory). Plaintiff is harmed by the surprise and the need at this late date to prepare to show mitigation of damages at a trial that is just weeks away. He was also deprived of his opportunity to take further discovery on mitigation, including the possibility of retaining an expert to opine on the issue.

Accordingly, the Court will grant the portion of Plaintiff's Motion seeking summary judgment on Defendants' affirmative defenses.

**B.    Defendants' Motion**

Defendants move for summary judgment on Count IV, Count V, Count VI, Count VII, and Count IX. The Court addresses each of these counts in turn.

## 1. Count IV – Defamation against Defendant Thompson

Defendants move for summary judgment on Plaintiff's claim for defamation against Defendant Thompson (Count IV) on the basis that there are no genuine issues of material fact and Plaintiff has failed to establish that Thompson waived his qualified common interest privilege. (D.I. 109 at 9-10) Plaintiff counters that Thompson waived the privilege when he knowingly made a false statement in one of his letters that was distributed to five DSU-related individuals about Plaintiff and that, at a minimum, there is an issue of fact as to whether Thompson made the statement knowingly. (D.I. 126 at 2-3) The Court agrees with Defendants that no reasonable jury could find in favor of Plaintiff on his defamation claim.

Defamation is defined as "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held." *Spence v. Funk*, 396 A.2d 967, 969 (Del. 1978). The tort of defamation consists of libel, which is written defamation, and slander, which is oral defamation. *See Eaton v. Raven Transp., Inc.*, 2010 WL 4703397, at *2 (Del. Super. Nov. 15, 2010). The elements of defamation are: "(1) a defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury." *Id.* "It is hornbook law that truth is an absolute defense to a defamation action." *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1155 (Del. 1981). Additionally, a statement of fact will not be deemed libelous if it is "substantially true." *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998). "Immaterial errors do not render a statement defamatory so long as the 'gist' or 'sting' of the statement is true." *Id.*

An employer may be protected by a qualified common interest privilege against a defamation claim when the employer is discussing an employee with other certain people. The qualified common interest privilege protects "communication . . . between two parties who have a common interest for the protection of which the allegedly defamatory communications are made." *Bickling v. Kent Gen. Hosp., Inc.*, 872 F. Supp. 1299, 1307 (D. Del. 1994) (internal quotation marks omitted). Discussions about the "character or qualifications of an employee or former employee made to any person who has a legitimate interest in the subject matter" may fall within the scope of this privilege. *Id.* (internal quotation marks omitted).

This "conditional privilege must be exercised with good faith, without malice and absent any knowledge of falsity or desire to cause harm." *Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 437 F. Supp. 2d 235, 247 (D. Del. 2006) (internal quotation marks omitted). The privilege is deemed waived if it is abused, such that "statements are made 'with an improper motive' or when the statements are made with actual malice." *Bickling*, 872 F. Supp. at 1308. Improper motive includes "the making of a statement which the speaker knows is false." *Id.* (internal quotations omitted).

Here, Plaintiff's defamation claim is based on two letters: (1) the June 1, 2012 letter Thompson sent Plaintiff discussing Plaintiff's actions during the March 1, 2012 protest; and (2) the August 17, 2012 letter, or the "Discharge Memorandum," which also discussed Plaintiff's behavior at the protest. (D.I. 58 ¶¶ 137-38; *see also* D.I. 109 at 9-10) Both letters were addressed to Plaintiff and copied to at least five DSU administrators. (*See* D.I. 58 ¶ 139; D.I. 109 at 9-10) These administrators held a legitimate expectation in Plaintiff's employment, and subsequent termination, so Thompson's statements are protected by the qualified common interest privilege, shifting the burden to Plaintiff to show that the privilege has been waived due

either to an improper motive or actual malice.  *See Bickling*, 872 F. Supp. at 1308.

Even taking the evidence in the light most favorable to Plaintiff, no reasonable factfinder could find that the privilege was waived, as none could reasonably find that Thompson acted with an improper motive or actual malice.   Plaintiff points only to one statement in the June 12 letter: "With respect to assaulting the Chief of Police, the video evidence is clear: you shoved the Chief in his chest."  (D.I. 126 at 3-4) (citing D.I. 109 Ex. 24)   Plaintiff insists that Thompson could not possibly have believed this statement because, months earlier, he had received an email from Dr. Steven Newton, stating "the video doesn't show you[] why he is arrested" (D.I. 126 at 4) (citing D.I. 127 Ex. B), and no video showing the reason for the arrest is in evidence (*see* D.I. 126 at 4).   But Plaintiff's view ignores that several videos circulated on social media, so the "video evidence" on which Thompson was relying may have differed from that being addressed by Newton, and that Thompson may have been relying on input he received from HR investigators as opposed to forming his own independent view of what the videos demonstrated, as Thompson testified in his deposition (D.I. 109 Ex. 41 at 241-44).   *See generally Sovie v. Town of N. Andover*, 742 F. Supp. 2d 167, 176 (D. Mass. 2010) (applying Massachusetts law, which is similar to Delaware defamation law, and finding no waiver of privilege where employer "wrote the memorandum based on information provided to him by other employees and he was entitled to rely on such information as a summary of what the employees had observed or experienced," even if statements relied on turned out to be false).   There is simply nothing in the record from which a reasonable factfinder could find that Thompson knew his statement was false at the time he made it, or that he was acting with actual malice when he made it.

Therefore, the Court will grant summary judgment for Defendants as to Count IV.

### 2.   Count VI – Substantive and Procedural Due Process Claims Against Defendants Williams and Thompson

The Fourteenth Amendment prohibits deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. When a plaintiff sues under 42 U.S.C. § 1983 based on a state actor's alleged failure to provide procedural due process, courts engage in a two-step analysis. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). First, courts must determine "whether the asserted individual interests are encompassed within the [F]ourteenth [A]mendment's protection of life, liberty, or property." *Id.* (internal quotation marks omitted). If so, courts then ask "whether the procedures available provided the plaintiff with due process of law." *Id.*

State law determines whether a property interest exists in state employment. *See Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005). "The plaintiff must demonstrate entitlement to a property interest created expressly by state statute or regulation or arising from government policy or a mutually explicit understanding between [the parties]." *Carter v. City of Phila.*, 989 F.2d 117, 120 (3d Cir. 1993).

With regard to substantive due process, "when a plaintiff challenges a non-legislative state action (such as an adverse employment decision), we must look, as a threshold matter, to whether the property interest being deprived is 'fundamental' under the Constitution." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000). "If it is, then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used." *Id.* "If the interest is not 'fundamental,' however, the governmental action is entirely outside the ambit of substantive process." *Id.*

Here, Plaintiff does not have a fundamental interest in his promotion or employment with DSU. "State-created rights such as [Plaintiff's] contractual right to promotion do not rise to the level of 'fundamental' interests protected by substantive due process." *Charles v. Baesler*, 910

F.2d 1349, 1353 (6th Cir. 1990); *see also Local 342 v. Town Bd.*, 31 F.3d 1191, 1196 (2d Cir.

1994) ("We do not think . . . that simple, state-law contractual rights, without more, are worthy

of substantive due process protection."); *Mrazek v. Stafford Twp.*, 2016 WL 5417197, at *8

(D.N.J. Sept. 28, 2016) (stating similar rights "'bear little resemblance to the fundamental

interests' [that] enjoy substantive due process protections") (quoting *Nicholas*, 227 F.3d at 140);

*Bheemarao v. City of New York*, 141 F. Supp. 2d 446, 450 (S.D.N.Y. 2001) ("Even assuming . . .

the existence of . . . a right [to a promotion], no one could seriously contend that it would qualify

as a fundamental, constitutional right.").[6]  Nor did Plaintiff have a fundamental interest in his

employment.  "[P]ublic employment is a wholly state-created contract right; it bears little

resemblance to other rights and property interests that have been deemed fundamental under the

Constitution." *Nicholas*, 227 F.3d at 143.  Even tenured professors at state universities have

been found not to have a property interest (sufficient for Substantive Due Process protection) in

continued employment, *see id.*, and Plaintiff was not even a tenured professor (but was instead

employed under a terminal one-year contract). *Id.* (finding that professor did not hold property

interest in his tenured employment at university).

   Plaintiff's claims of violations of his right to Procedural Due Process fare little better.   In

order to prevail on his claim, Plaintiff needs to show the (i) deprivation by state action of a

constitutionally protected interest in life, liberty, or property (ii) without due process of law.

*See Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *Kaminski v. Twp. of Toms River*, 595 Fed.

App'x. 122, 125 (3d Cir. 2014).   In their Motion, Defendants contend that they should be

_____

   [6] The parties each discuss the applicability of *Mitchell v. Cooper*, 228 F. Supp. 3d 343
(D. Del. 2017), to the substantive due process claim with regard to promotion.  (D.I. 109 at 11;
D.I. 126 at 5; Tr. at 62-63)  There, this Court found that the police-officer-plaintiffs did not have
a fundamental right to promotions protected by Substantive Due Process.

granted summary judgment, even assuming *arguendo* that Plaintiff has a property interest,

because Plaintiff cannot show that he was not afforded notice and an opportunity to respond.

(D.I. 109 at 12)   In response, Plaintiff contends that he was not afforded proper due process in

connection with both his denied promotion and his termination because he was not given the

opportunity to defend himself against the allegations made against him.   (D.I. 126 at 7-12)[7]

       With regard to the denied promotion, the Court agrees with Defendants that Plaintiff's

claim fails because "promotional guidelines for a public university's faculty do not create a

constitutionally protected property interest."   (D.I. 136 at 3; *see also Kmetz v. Univ. of

Delaware*, 2014 WL 2885440, at *2 (D. Del. June 25, 2014) (finding that plaintiff, tenured

professor who was denied promotion, did not have protected interest in connection with

defendant's promotional guidelines).   With regard to termination, accepting the assumption

(without deciding) that Plaintiff had a constitutionally protected property interest, no reasonable

factfinder could find that Plaintiff was deprived of adequate "notice and opportunity for hearing

appropriate to the nature of the case."   *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542

(1985) (internal quotation marks omitted).   Such a hearing "need not be elaborate" and

"something less than a full evidentiary hearing is sufficient prior to the adverse administrative

action."   *Id*. at 545 (internal quotation marks omitted).   A reasonable factfinder could only find

that Plaintiff was given notice that his termination was being considered (*see, e.g.*, D.I. 127 Ex.

T) ("Notice of Paid Administrative Leave" mailed and emailed to Plaintiff on day following

_____

    [7] The Court agrees with Defendants that Plaintiff's operative complaint fails even to
allege a Procedural Due Process violation in connection with Plaintiff's failure to be promoted;
as it concerns promotions, it only states a claim for violation of Substantive Due Process.   (D.I.
136 at 3)   Therefore, Plaintiff is incorrect that Defendants' waived their opportunity (D.I. 126 at
7) to seek summary judgment on this claim.   In the interests of completeness, the Court will
address both the claim and Defendants' motion for summary judgment on it.

protest, directing Plaintiff to call DSU on next business day "to schedule a meeting to discuss

these allegations"), and that he was invited to appear and be heard before a decision would be

made (*see, e.g.*, D.I. 109 Ex. 29) (May 3, 2012 letter advising Plaintiff investigation was

concluded and inviting him to attend May 9, 2012 meeting "to present whatever facts [he] may

believe are relevant to that incident"). That Plaintiff would have preferred a fuller or different

process (*see, e.g.*, D.I. 126 at 9-11)—including a more thorough investigation, a greater

opportunity for him to identify and present witnesses, and a right to counsel—or hearings at

different times (e.g., not so soon after he was released from medical treatment or only after his

criminal case was completed) does not render the process he was afforded constitutionally

deficient. *See generally Speiser v. Engle*, 107 F. App'x 459, 461 (6th Cir. 2004) (noting there is

"no constitutional right to counsel at the [pre-disciplinary] meeting"); *Atwell v. Lisle Park Dist.*,

286 F.3d 987, 991 (7th Cir. 2002) ("The employee has no right to skip the interview merely

because he has reason to think he'll be asked questions the answers to which might be

incriminating. He may be asked other questions as well. Or he may be told that he can take the

Fifth without repercussions. Or that the interviewer will merely draw an adverse inference from

the employee's taking the Fifth, which is permitted in civil cases."); *see also Thomas v.

Delaware State Univ.*, 626 F. App'x 384, 388 (3d Cir. 2015) (noting that defendant complied

with due process because it sent plaintiff letter "informing her of the reasons for the proposed

termination" and held hearing and "regardless of whether the hearing may have comported with

the requirements set forth in the [CBA], it comported with the constitutional requirements of due

process")[8]

---

[8] The Court need not reach Defendants additional contention that Plaintiff also failed to
exhaust his post-termination options, including the grievance procedures set out in a Collective

Defendants additionally seek summary judgment on the stigma-plus portion of Plaintiff's claim against Williams and Thompson (i.e., Count VI) on the grounds that: (1) neither individual made defamatory remarks about Plaintiff, (2) Plaintiff was not denied employment opportunities, and (3) Plaintiff was afforded the opportunity to be heard. (D.I. 109 at 13-14) Plaintiff disagrees, stating that: (1) Williams and Thompson knowingly made false statements; (2) Plaintiff could only find "low wage employment" and was not hired for tenure-track positions because of his termination; and (3) Plaintiff was not given a name-clearing hearing. (D.I. 126 at 12-13)

In order to establish "a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). This is called the "stigma-plus test." *Id.* Plaintiff must show that: (1) the employer publicly made and disseminated false and defamatory statements or impressions about Plaintiff in connection with his termination; (2) Plaintiff suffered "the loss of the protected property interest of the employment;" and (3) Plaintiff was not given a name-clearing hearing. *Otto v. Williams*, 704 F. App'x 50, 53 (3d Cir. 2017); *see also Golovan v. Univ. of Delaware*, 73 F. Supp. 3d 442, 451 (D. Del. 2014).

Plaintiff's claims fail at the first requirement: there is not evidence from which a reasonable factfinder could find that Williams or Thompson made *any* public statements about him (and, with respect to Williams, that he even made any statements about him). (*See* D.I. 126 at 12-14) Moreover, as already explained, Plaintiff cannot prevail on his defamation claim,

---

Bargaining Agreement ("CBA"). (D.I. 109 at 13; D.I. 136 at 5)

leading to the conclusion that he also cannot prevail on his stigma-plus claim.[9]

Defendants are entitled to summary judgment on the final aspect of Plaintiff's constitutional claims as well, a purported violation of the Takings clause of the Fifth Amendment, which prohibits "private property [from being] taken for public use, without just compensation." U.S. Const. amend V. Plaintiff was required "to pursue Delaware state law remedies for the alleged taking" before pursuing a federal claim. *Abbiss v. Delaware Dep't of Transp.*, 712 F. Supp. 1159, 1162 (D. Del. 1989). For example, Plaintiff could have—but did not—filed an action in replevin to obtain any personal belongings Defendants took when he was terminated. *See* 25 Del. C. § 4005. Alternatively, or in addition, Plaintiff could have accepted the invitation Defendants made him to remove or retrieve his belongings from his office.[10] Because Plaintiff failed to exercise his state remedies, his claim must fail.

Accordingly, the Court will grant summary judgment to Defendants on Count VI.

### 3. Count V - Retaliation in Violation of 42 U.S.C § 1983 and First Amendment Against Individual Defendants

Plaintiff asserts that Defendants Williams, Downes, and Buchwald retaliated against him for his role in the protest, in violation of 42 U.S.C. § 1983 and the First Amendment. (D.I. 58 ¶¶ 145-50)[11] Specifically, he alleges that Williams placed him on administrative leave and

---

[9] Even taking into consideration the emails in the record (*see* D.I. 127 Ex. Z) from other universities, no reasonable factfinder could find that all three elements of a stigma-plus claim are met, for reasons explained throughout this Opinion.

[10] On July 17, 2013, DSU sent a letter to Plaintiff asking him to "please make arrangements to have all personal items removed from your office no later than July 26, 2013." (D.I. 109 Ex. 31) It further instructed Plaintiff to contact Public Safety to schedule a date and time to retrieve the belongings. (*Id.*)

[11] Although the operative complaint purports to bring Count V against all Defendants except DSU (D.I. 168 ¶¶ 144-50), the allegations contained in it relate only to Defendants

subsequently terminated his employment and that both Downes and Buchwald arrested him during the protest, "preventing him from exercising his right to free speech, assembly, and [to] grieve government, and retaliat[ing] against him for holding certain viewpoints and speaking to certain subject matter regarding HBCUs." (*Id.* ¶¶ 147-48)

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *White v. Napoleon,* 897 F.2d 103, 111–12 (3d Cir. 1990). The First Amendment bars retaliation for protected speech. *See Crawford–El v. Britton,* 523 U.S. 574, 592 (1998); *Milhouse v. Carlson,* 652 F.2d 371, 373-74 (3d Cir. 1981). Under § 1983, "[t]o plead retaliation for the exercise of First Amendment rights, a plaintiff must allege (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Mirabella v. Villard,* 853 F.3d 641, 649 (3d Cir. 2017) (internal quotation marks omitted). "When there is more than one defendant, [Plaintiff] must show that each defendant individually participated or acquiesced in each of the alleged constitutional violations." *Smith v. Cent. Dauphin Sch. Dist.*, 355 Fed. App'x. 658, 667 (3d Cir. 2009); *see also Roberts v. Ferman,* 2011 WL 2937398, at *12 (E.D. Pa. July 20, 2011) ("Where a plaintiff brings [a] First Amendment retaliation claim against multiple defendants, the plaintiff must establish that each individual defendant participated in or approved of each of the alleged violations.").

No reasonable factfinder could find for Plaintiff on his claim against Williams. Plaintiff does not dispute that Williams was not the DSU employee who placed Plaintiff on administrative

---

Williams, Downes, and Buchwald. The Court views the claim as limited to these Defendants and, hence, will only address arguments relating to these Defendants.

leave or terminated his employment. Instead, Plaintiff relies on Section 10.4.4 of the CBA,

which he contends "places the ultimate burden for faculty discharge and sanctioning on the

'President of the University or his designee'" (D.I. 126 at 14) (citing D.I. 109 Ex. 2), adding that

Thompson's June 19, 2012 letter (D.I. 109 Ex. 26) indicated that DSU would follow Section

10.4.4. (*See* Tr. at 63-64) Among the flaws with Plaintiff's position is that Section 10.4.4

applies to tenured faculty members, and therefore not to Plaintiff, so Williams' approval prior to

Plaintiff's termination was not required. (*See* D.I. 109 Ex. 2) Plaintiff further claims that

Williams should be liable because he was carbon copied on two letters addressed to Plaintiff that

discussed his discharge after the protest. Plaintiff has adduced no evidence from which a

reasonable factfinder could reject Williams' testimony that he did not review or approve letters

sent to Plaintiff (on which Williams was copied), he did not take part in the investigation, and he

had no role in DSU's decision to terminate Plaintiff. (D.I. 109 Ex. 42 at 214-16)

With regard to Downes and Buchwald, who are DSU police officers, Plaintiff's theory

seems to be that they retaliated against him because they knew either prior to, or almost

immediately upon encountering him at, the protest that he "was a troublemaker" for DSU and

they disapproved of his speech. (Tr. at 65) Plaintiff contends that a reasonable jury could find

that his conduct at the protest was constitutionally protected (exercising his First Amendment

rights), the retaliatory action (the arrest) would deter him from exercising his constitutional rights

(to protest), and that his conduct (being present and speaking at the protest) was what motivated

the retaliatory action (the arrest). (*See* D.I. 126 at 15; *see also* D.I. 58 ¶ 148) Defendants

contend that Downes and Buchwald could not have retaliated because they did not know

anything about Plaintiff or who he was; their involvement with Plaintiff did not begin until the

day of the protest; and neither of them was aware prior to arriving at the protest that Plaintiff

would be there.   (D.I. 109 at 16)

While a close call, the Court agrees with Plaintiff that a reasonable factfinder, taking the evidence in the light most favorable to Plaintiff, could find that Downes and Buchwald retaliated against him for his exercise of his First Amendment rights.   Plaintiff points to evidence that, prior to the protest, Downes had known about the upcoming protest and that Plaintiff had shown his class a flyer which was possibly related to the protest.   (D.I. 109 Ex. 17)   There is also evidence that Downes issued a public announcement the day before the protest, acknowledging that a protest was being planned, and reminding the organizers to obtain a permit.   (D.I. 109 Ex. 15)   Further, a reasonable jury could agree with Plaintiff that videos in the record show Downes and Buchwald being exposed to the nature of the speech being conveyed at the protest once they arrived at it and then approaching only Plaintiff, which may be found to have occurred in an effort to chill his exercise of his rights.   (*See, e.g.*, Tr. at 65-66) (discussing evidence)   There are also genuine disputes of material fact as to whether the police were called in response to the protest because the protesters lacked a permit (*see* D.I. 127 Ex. CC at 33) or for some other reason, and why Plaintiff was arrested (because Plaintiff "swung his arm back and hit [Downes]" after cursing at Downes (D.I. 127 Ex. CC at 34-35, 49-50; *see also* Tr. at 72-73) or for some other reason).   For these reasons, the Court will deny summary judgment on Count V as it pertains to Downes and Buchwald.

### 4.    Count VII – Intentional Discrimination Against Delaware State University

Plaintiff alleges that that DSU discriminated against him by: (1) denying him a promotion; (2) placing him on paid administrative leave; (3) forcing him to sign a terminal contract; (4) terminating him; (5) promoting Caucasian female employees instead of him; (6) issuing a "no trespass" notice to him; and (7) arresting him without probable cause.   (D.I. 58 at ¶

160) To prevail on a claim under Title VII for employment discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination, such as might occur when a similarly-situated person not of the protected class is treated differently. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Jones v. School Dist. of Philadelphia*, 198 F. 3d 403, 410 (3d Cir. 1999).

If a plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant employer to proffer a "legitimate non-discriminatory" reason for its actions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If a defendant meets this burden, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *See id.* at 142-43. To do this, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "To avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 537 (3d Cir. 2006).

It is undisputed that Plaintiff is a member of a protected class (race) and that he suffered adverse employment decisions (not being promoted and later being terminated). (*See* Tr. at 52)

The disputes go to whether Plaintiff was qualified and whether he was terminated under circumstances which could reasonably be inferred to be discriminatory.

Plaintiff contends that a reasonable jury could find he has met his burden based on his identification of similarly-situated comparators who were treated better than him. (*See* D.I. 126 at 18-19) In this regard, Plaintiff must show that he and the employee(s) are similarly situated in all relevant respects. *See Houston v. Easton Area Sch. Dist.*, 355 Fed. App'x. 651, 654 (3d Cir. 2009). "Whether a comparator is truly similarly-situated to the plaintiff is an issue of law." *Moore v. Shinseki*, 487 Fed. App'x. 697, 698 (3d Cir. 2012) (internal citation omitted). Whether a factor is relevant for purposes of a "similarly situated" analysis must be determined by the context of each case. *See Houston*, 355 Fed. App'x. at 654. "In disciplinary cases or in the context of personnel actions, for example, the relevant factors often include a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id*. at 654 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000))).

Plaintiff has not identified any similarly-situated comparators. He points to (1) two Caucasian female professors that he alleges are less qualified than him but yet were promoted; (2) one Caucasian female employee who assaulted a DSU police officer and was not terminated; and (3) a mostly Caucasian female equestrian team that led a protest without a necessary permit but also without any incurring any subsequent arrests. (D.I. 126 at 18-19; *see* D.I. 109 at 17;) The female professors were not similarly situated in their careers: instead of applying for tenure on an accelerated track, as Plaintiff did, they applied at the ordinary time, in their fourth year. (*See* D.I. 109 at 17-18; *id.* Ex. 2) Plaintiff, hence, by his own choice, had to meet an

"exceptional" qualifications standard that the Caucasian females (who had taught longer than Plaintiff, and had other qualifications he lacked) did not. (*See* D.I. 109 Ex. 8) The Caucasian female who assaulted the DSU police officer was a secretary, not a professor; she was sent a Notice of Administrative Leave and Intent to Terminate, and was subsequently terminated. *See Thomas v. Delaware State Univ.*, 626 F. App'x 384, 386 (3d Cir. 2015). None of this supports an inference of discriminatory intent by DSU directed against Plaintiff. Lastly, with respect to the nearly all-Caucasian female DSU Equestrian Team that participated in a protest without a permit, Plaintiff has failed to show a meaningful comparison can be made between him and a team of students, particularly where there are no allegations of assault on police officers by any of the students.

Plaintiff further contends that he has established a discriminatory motive without the use of comparators given the "[s]ubstantial evidence demonstrat[ing] DSU's desire to hire and promote white faculty members over their African American counterparts, such as [Plaintiff]." (D.I. 126 at 16; *see also* Tr. at 53 ("[Plaintiff is] relying on [comparators] as a piece of the puzzle.")) Plaintiff further contends that "[i]n the HBCU context, where the faculty was traditionally African American, this type of discrimination was packaged as 'diversity.'" (D.I. 126 at 16; *see also id.* at 16-18 (citing evidence purporting to show DSU reduced number of tenured African-American faculty in name of diversity) Plaintiff also relies on emails between Stevenson and Newton that indicate there was a desire to have Plaintiff no longer work at DSU. (Tr. at 53-54) Plaintiff's primary support is testimony from retired DSU professor, Dr. Hayward, who stated that between 1984 and 2012 (during his time at DSU) the faculty changed from "all black" to "70 percent white." (D.I. 127 Ex. GG)

Defendants preview substantial evidence they can use to cross-examine Dr. Hayward.

They note that he was unable to provide examples of racial discrimination and relied on Plaintiff's (contested) account of events as the basis of much of his testimony. (D.I. 136 at 9-10; *see also* D.I. 127 Ex.GG) They further contend that decisions with respect to Plaintiff's employment and promotion were based on Plaintiff's work performance and were unrelated to his race. (*See* Tr. at 67).

It is not the role of the Court to evaluate credibility of witnesses or weigh the evidence. It is sufficient to hold that the Court agrees with Plaintiff that a reasonable factfinder taking the evidence in the light most favorable to Plaintiff could find that Defendants were acting in an intentionally discriminatory manner. Such a factfinder could find that Plaintiff has made out a *prima facie* case and could reject Defendants' proffered non-discriminatory explanations for its conduct.

For these reasons, the Court will deny summary judgment as to Count VII.

### 5.     Count IX – Retaliation against Delaware State University

Plaintiff alleges that DSU retaliated against him in various ways after he filed his EEOC claim. (D.I. 109 at 18-19; D.I. 58 ¶¶ 169-76)   To establish a *prima facie* case of retaliation, a plaintiff must show: (1) he engaged in a protected activity; (2) after or contemporaneous with engaging in that protected activity, he was subjected to an adverse employment action; (3) the adverse action was "materially adverse;" and (4) there was a causal connection between his protected activity and the adverse employment action. *See Hare v. Potter*, 220 Fed. App'x. 120, 127 (3d Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Although timing and ongoing antagonism have often been the basis for the causal link, [Third Circuit] case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the

inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000). An individual is not protected from all retaliation, only from retaliation that produces an injury or harm. *See Burlington*, 548 U.S. at 67. Hence, a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal citations and quotation marks omitted). "[I]t is important to separate significant from trivial harms." *Id.* If the plaintiff proves a *prima facie* retaliation claim, the *McDonnell Douglas* burden-shifting analysis described above applies. *See Hare*, 220 Fed. App'x. at 127.

Defendant moves for summary judgment principally on the ground that Plaintiff cannot prove causation by reliance on a temporal connection between his protected conduct and the alleged retaliation because it was "six months between DSU's awareness of the EEOC complaint and the first adverse employment action (the denial of [Plaintiff's] first promotion application in February, 2012)." (D.I. 136 at 10) Plaintiff seeks to shorten the timeframe by claiming only a few months passed between DSU learning of Plaintiff's EEOC charge and Dean Stevenson's attitude toward Plaintiff appearing to change. (Tr. at 58) "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing to cases that found three- and four-month periods insufficient to establish causality). Here, a reasonable factfinder could not find a causal connection based just on the timing of events.

But Plaintiff is not basing its claim solely on the purported timeline. He also identifies

30

evidence from which a reasonable factfinder could find that Stevenson acted with "retaliatory animus" toward Plaintiff. (*See* D.I. 126 at 20; *see also Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) ( "The passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is *no evidence of retaliatory animus* during the intervening period.") (emphasis added)) A reasonable factfinder could find that Stevenson's post-EEOC filing statement in an email that Plaintiff was "going to get it," as well as his comment that he would not overturn the decision of the promotion committee, were parts of a "campaign" to get rid of Plaintiff. (D.I. 126 at 20; Tr. at 57) Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury may conclude that there was animus and, thus, a causal connection.

For these reasons, the Court will deny summary judgment as to Count IX.

## CONCLUSION

For the reasons stated, both Plaintiff's Motion for Summary Judgment (D.I. 112) and Defendants' Motion for Partial Summary Judgment (D.I. 107) will be denied-in-part and granted-in-part as set out above. The case will proceed on the following claims: (i) Count I (False Arrest and False Imprisonment against Downes, Campalone, and Buchwald); (ii) Count II (ADAAA claim against DSU); (iii) Count III (Breach of Contract against DSU); (iv) Count V (Retaliation against all Defendants except DSU); (v) Count VII (Intentional Discrimination against DSU); (vi) Count VIII (Hostile Work Environment against DSU); and (vii) Count IX (Retaliation against DSU). An appropriate Order follows.